**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DISTRICT OF ST. THOMAS AND ST. JOHN**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **LIANA REVOCK, Executrix of the** | ) | |
| **Estate of BARBARA WALTERS,** | ) | **CIVIL NO. 12-00024** |
| | ) | |
| **Plaintiff,** | ) | **Action for: Housing** |
| | ) | **Discrimination; Negligent** |
| **v.** | ) | |
| | ) | |
| **COWPET BAY WEST CONDOMINIUM** | ) | **Infliction of Emotional Distress;** |
| **ASSOCIATION; THE BOARD OF THE** | ) | **Intentional Infliction of Emotional** |
| **COWPET BAY WEST CONDOMINIUM** | ) | **Distress; Punitive Damages; and** |
| **ASSOCIATION; MAX HARCOURT in his** | ) | **Declaratory Judgment** |
| **personal capacity; ALFRED FELICE;** | ) | |
| **LANCE TALKINGTON; ROBERT** | ) | **JURY TRIAL DEMAND** |
| **COCKAYNE; VINCENT VERDIRAMO,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' COWPET BAY WEST CONDOMINIUM ASSOCIATION, THE BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION & VINCENT VERDIRAMO'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Plaintiff, **LIANA REVOCK, Executrix of the Estate of BARBARA WALTERS** ("Walters"), by and through her undersigned counsel, **LAW OFFICES OF KARIN A. BENTZ, P.C.**, (Karin A. Bentz, Esq.), and hereby respectfully submits this Opposition to the Motion for Summary Judgment filed by Defendants **COWPET BAY WEST CONDOMINIUM ASSOCIATION** ("Cowpet" or "the Association") the **BOARD OF THE COWPET BAY WEST CONDOMINIUM ASSOCIATION** ("the Board") and **VINCENT VERDIRAMO** (collectively "Defendants").

The facts and evidence supporting this response are contained in Plaintiff's Response to Defendants' Statement of Undisputed Material Facts and Plaintiff's Counter-statement of Facts. As demonstrated below, Defendants' Motion for Summary Judgment should be denied, because they have not shown that there does not exist genuine issues of material facts as to Plaintiff's claims under the Fair Housing Act and under the common laws of the Territory of the Virgin Islands.

## PRELIMINARY STATEMENT

In February 2011, Walters submitted a request to the Association to be allowed to keep an emotional support animal at her Cowpet Bay West condominium in accordance with the Fair Housing Act and Fair Housing Amendments Act (jointly "FHA"). CSOF ¶8. The request included a diagnosis of an anxiety disorder requiring an emotional support animal from a licensed medical professional. CSOF ¶9. The Board discussed the request amongst themselves but did not reply to Walters. CSOF ¶15. In the subsequent board meetings the Board discussed amending the by-laws to prohibit dogs and farm animals and posting "No Dogs Allowed" signs around the property. CSOF ¶¶26, 28. During the board meeting on September 13, 2011, the Board discussed service dogs and mentioned that the dogs must be registered with the ADA. CSOF ¶31. The Board also opined that the Virgin Islands does not have guidelines for "service dogs." *Id.* Although the Board discussed Walters' request for reasonable accommodation, they took no action on Walters' application, even though it had been pending before them for more than six months. *Id.*

Cowpet's members began posting on the internet about Walters' request and medical condition on the "Cowpet Bay West Blog," ("the Blog") which was a website owned and run by Defendant Lance Talkington ("Talkington"). CSOF ¶¶32, 33. Defendants Alfred Felice ("Felice"), Talkington, and Max Harcourt ("Harcourt") subsequently went on a campaign among Cowpet's members to intimidate, discredit, and harass Walters because of her requested accommodation. CSOF ¶¶40, 43, 44, 47. Cowpet's members attacked the request, questioning the dog's "qualifications," and Harcourt later shared the content of Walters' application and her mental condition that supported it. CSOF ¶¶55, 63, 68. Indeed, Cowpet admits: (1) a majority of its members were opposed to having dogs on the premises that were owned by non-handicapped members and that its membership sent emails and commented on the blog asserting that Walters' dog was not medically necessary and asking that fines be implemented;

(2) Cowpet discussed amending the by-laws as a result; (3) the by-laws were subsequently amended by a member vote; and (4) it did not grant Walters' request for accommodation until March of 2012. CSOF ¶¶33, 35, 40, 56, 77, 80, 117. Members posted comments on the blog asserting that the FHA is a "BAD LAW!!!!!" that allows a person with mental illness who "might go off his/her gourd" to have a "pet." CSOF ¶43.

On December 16, 2011 the Board received a letter from Karin A. Bentz, Esq on behalf of Walters. CSOF ¶84. In this letter, Attorney Bentz informed the Board that under the FHA, Walters is qualified to keep Happy to assist her with her disability. *Id.* The Board was further advised that they could not engage in any conduct that would punish or deprive Walters of her right to keep Happy on the premises. *Id.* On January 11, 2012, in response to all the complaints, the Board met and voted to fine Walters $50 a day for having her emotional support animal. CSOF ¶86. Then, in February, the Board voted to incorporate the no-dogs rule into Cowpet's by-laws and to submit them to the membership for approval. CSOF ¶111. The amended by-laws provide that an exception would be granted "should an owner require the assistance of a service animal (dog) as defined by the ADA." CSOF ¶77. It did not include an exception for a reasonable accommodation for an emotional support animal under the FHA. CSOF ¶77.

In the year since Walters began her long and painful process of her request for the accommodation, the Board, as advised by Vincent Verdiramo ("Verdiramo"), made no allowances for emotional support animals under the FHA. Finally, on March 26, 2012 Defendants granted Walters' request for a reasonable accommodation to keep her emotional support animal in her condo. CSOF ¶117. She was not informed until April 11, 2012. CSOF ¶118. Walters suffered such a prolonged pattern of harassment and vilification by Defendants on the blog and through emails that her suffering became unbearable and on or about April 22, 2014 she took her own life. CSOF ¶123.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Hershey v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir. 1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir. 1983). In determining whether there are genuine issues of material fact, the court must resolve all reasonable doubts in favor of the nonmoving party. *See Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983); *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Under the standards announced by the Supreme Court's trilogy in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita*, 475 U.S. 574 (1986), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

The moving party has the burden of establishing the absence of genuine issues of material fact. *Id.* at 249. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) the Supreme Court clarified that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." The Court's holding is based on Rule 56(e) of the Federal Rules of Civil Procedure which states:

(e) FAILING TO PROPERLY SUPPORT OR ADDRESS A FACT.

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    (1)  give an opportunity to properly support or address the fact;

    (2)  consider the fact undisputed for purposes of the motion;

    (3)  grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

    (4)  issue any other appropriate order.

Fed. R. Civ. P. 56(e).

      Defendants' Motion for Summary Judgment was not only filed late (on February 1, 2020 a day after the January 31 deadline) but was also filed <u>without any supporting exhibits</u> and therefore should be disregarded by this Court. By failing to inform this Court of the basis of its motion, Defendants Motion for Summary Judgment was not properly supported as required by Rule 56. Not one single exhibit was filed until 14 days after the original Motion for Summary Judgment was filed by the Defendants.  Therefore, Defendants did not file a Motion for Summary Judgment as required by Rule 56 and Plaintiffs were unable to respond to the alleged facts in the Motion. Without any exhibits, Defendants cannot demonstrate the absence of any genuine issue of material fact and their motion should be denied.[1]

## <u>ARGUMENT</u>

      In the Virgin Islands "[t]o prevail on a failure to accommodate claim, a plaintiff must prove that (1) she is disabled within the meaning of the FHA; (2) she requested a reasonable accommodation; (3) the requested accommodation was necessary to afford her an opportunity to use and enjoy her dwelling; and (4) defendant refused to make the accommodation."[2] *Nelson*

---

[1] The fact that Defendants eventually filed exhibits 14 days late is immaterial as such exhibits should be struck from the record as untimely.

[2] These four factors are a minor variation on an earlier decision by this Court that articulated the elements slightly differently. In *Bedell v. Long Reef Condominium Homeowners Association*, 2013 WL 6405173 at *6 (D.V.I. Dec. 6, 2013) this Court outlined the elements of a claim of failure to accommodate as: "(1) the plaintiff is suffering from a disability as defined under the FHA; (2) the defendant knew or reasonably should have been expected to know of the alleged disability and requested accommodation; (3) the requested accommodation is reasonable and necessary to afford plaintiff an equal opportunity to use and enjoy his dwelling; and (4) the defendant refused to make a reasonable accommodation."

Case: 3:12-cv-00024-RAM-RM   Document #: 318   Filed: 02/27/20   Page 6 of 23

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*                    Civil No. 12-00024
Opposition to Board & Ass. Motion for Summary Judgment                                        Page 6

*v. Long Reef Condominium Homeowners Association*, 2016 WL 4154708 at *16 (D.V.I. Aug. 5, 2016) (*citing Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014); *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.Appx. 617, 621 (6th Cir. 2011)).

Defendants' Motion for Summary Judgment and supporting Memorandum essentially concedes the first three elements. Defendants do not contest that Plaintiff was disabled within the meaning of the FHA, that she requested a reasonable accommodation, or the that requested accommodation was necessary. Defendants' only argument to support their motion is that they did not refuse to make the accommodation.

## I.   DEFENDANTS DENIED WALTERS' REASONABLE REQUEST FOR ACCOMMODATION BECAUSE THEY FAILED TO CONDUCT A MEANINGFUL REVIEW

Defendants' first argument is that Plaintiff has failed to establish a violation of 42 U.S.C. § 3604(f)(3)(B) on the grounds that they did not deny Walters' request for reasonable accommodation because they had no "opportunity to conduct a meaningful review or provide Ms. Walters with a reasonable accommodation because Ms. Walters refused to permit the Association's Board of Directors the opportunity to review the Plaintiff's materials or request for a reasonable accommodation." CBW Summary Judgment Memorandum 2/1/20, p.9.

"For a housing provider's action to be considered a 'refusal' under the Fair Housing Act, the provider must have had a prior opportunity to accommodate." *Revock v. Cowpet Bay West Condominium Association*, 853 F.3d 96, 110 (3d. Cir. 2017) (*citing Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012)) (internal citations omitted). "For example, a housing provider may have an opportunity to accommodate because a plaintiff petitions for an accommodation or declares that she is entitled to it." *Revock*, 853 F.3d at 111 (*citing Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 821 F.3d 92, 98 (1st Cir. 2016)). An opportunity to accommodate means "an opportunity to make a final decision ..., which necessarily includes the ability to conduct a meaningful review of the requested

accommodation to determine if such an accommodation is required by law." *Nelson*, 2016 WL 4154708 at *18 (*quoting Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (internal quotations omitted)).

To conduct a meaningful review "in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the [FHA's] definition of disability [(i.e., has a physical or mental impairment that substantially limits one or more major life activities)]; (2) describes the needed accommodation; and (3) shows the relationship between the person's disability and the need for the requested accommodation." *Nelson*, 2016 WL 4154708 at *19 (*citing Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.Appx. 617, 621 (6th Cir. 2011) (internal quotation marks and citation omitted)). It should be noted that this standard puts the obligation on the housing provider to conduct the review and allows them to request information if they want. What it does not do is impose any obligation on the requesting party to provide specific information.

Under the FHA, when there is an opportunity to conduct a meaningful review, "[a]n undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." *See* Joint Statement of HUD and DOJ, *Reasonable Accommodations under the Fair Housing Act*, May 17, 2014, p.11[3]. "Denial of a reasonable accommodation request can be actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Nelson*, 2016 WL 4154708 at *18 (*citing Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000) (internal quotations omitted)); *see also Revock*, 853 F.3d at 110 ("An undue delay in granting a reasonable accommodation may amount to a refusal."); *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277,

---

[3] Available at: https://www.hud.gov/sites/documents/huddojstatement.pdf (last accessed 11/5/19).

1286 (11th Cir. 2014) (finding landlord's failure to make a decision on whether to accommodate emotional support animal for over six months constituted a constructive denial); *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.Appx. 617, 622 (6th Cir. 2011) (stating that "a housing provider that refuses to make a decision unless a requestor provides unreasonably excessive information could be found to have constructively denied the request by 'stonewalling' and short-circuiting the [interactive] process"); *accord Austin v. Town of Farmington*, 826 F.3d 622, 629 (2d Cir. 2016). A refusal "occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." *Revock*, 853 F.3d at 111 (*citing Groome Res. Ltd.*, 234 F.3d at 199).

### A.   Walters never refused Defendants Cowpet or the Board access to her file

Contrary to Defendants' argument, Walters never refused to permit the Association's Board of Directors the opportunity to review the Plaintiff's materials and Defendants cannot point to a single instance in which a member of the Board or Association asked to see the papers Walters had submitted and was refused by Walters. Defendants claim that Walters' complaint to the U.S. Department of Housing and Urban Development "admitted that the Defendants had [not] been allowed to view her file which included the subject 'paperwork' because she instructed the Association's office manager not to allow the Board of Directors access to her file." CBW Summary Judgment Memorandum 5/1/14, p.10. They also claim they "had no knowledge of the contents of any paperwork that Plaintiff submitted to the property manager of Cowpet because the Plaintiff refused to allow the entire Board of Directors to have access to the documents." CBW Summary Judgment Memorandum 5/1/14, p.10.

This entire argument is based on the false belief that Plaintiff secretly submitted paperwork but refused to allow anyone to review it and therefore never made a request for reasonable accommodation. This theory is utterly illogical and Plaintiff's alleged admission is taken completely out of context. Not only is it nonsensical for Plaintiff to submit paperwork

and then ban anyone from looking at it, if one looks at the full HUD complaint, and all the blogs and email correspondence that have been collected during discovery, it is clear that Walters is talking about preventing her confidential medical information from being shared with residents of Cowpet Bay West who are not board members. CSOF ¶¶20-25. After explaining in her HUD complaint about the harassment and public persecution suffered at the hands of other residents, Walters says: "Thank goodness, the office manager (a former nurse) has not let these people see my file (they did try). It is very awkward, as I am on the board of directors but the president (Max Hartcourt) [*sic*.] allowed this discussion to be opened to public scrutiny, and I don't trust them to keep my information private." *See* HUD complaint, p.6. The meaning of Walters' words is further confirmed in her letter of appeal to HUD on June 25, 2012. In that letter, Walters writes: "Personal information was leaked to outsiders regarding confidential medical records, i.e.: the need for the officer manager to protect my privacy." CSOF ¶100. It is clear from this statement that Walters was concerned that people outside of the Board, who had no right to see her confidential medical information, were being passed that information by certain members of the Board. In light of this concern, Walters asked Schechter, the office manager, to keep her information private and not to share it with those who had no right to it. CSOF ¶11.

The record unequivocally establishes that non-board members were trying to access Walters' file and her confidential medical information. On October 12, 2011, Talkington emailed Walters regarding her "service animal." CSOF ¶37. In this email, Talkington requested from Walters a copy of "what has been provided to the board regarding your medical condition". *Id.* Walters responded on that same day telling Talkington that he had no right to the information. CSOF ¶38. Talkington responded by telling Walters that he would continue to pursue obtaining copies of her application and that her "blatant violation" of the by-laws was completely intolerable. CSOF ¶39. Walters replied to Talkington that "[s]ince you are not a

member of the board, you are not the authority to whom ANYONE is accountable to". CSOF
¶38. This clearly proves that in Walters' mind there was a distinction between board members
and non-board members concerning who was allowed access to her files.

On October 13, 2011, Walters emailed the board with the subject line "This has gone
too far." In her email, Walters informed the board that she felt Talkington obtained her private
information from being allowed to attend board meetings even though he is not a board
member. CSOF ¶52. One resident, using the name "Anonymous" responded to Talkington's
blog by advising that Talkington file an official complaint with the board as the "best approach
to seeing her papers". CSOF ¶42. On October 30, 2011 the Board shared with Talkington a
letter Harcourt had written to Walters and Kromenhoek. Talkington then shared it on his blog.
CSOF ¶63.

Taking the record as a whole it is crystal clear that Walters submitted her paperwork
for review by the Board and only the Board and that she wanted it kept private and not disclosed
to other residents who were not board members and who would not, therefore, be involved in
the decision regarding reasonable accommodation. Walters explains her reasoning in her
October 20, 2011 email to Harcourt. In response to his request for ADA paperwork, Walters
replies: "I don't think that would be a problem, but the information must be kept confidential
or else the board member who discloses any information should himself/herself be subjected
to fine or suit or both." CSOF ¶24. Walters clearly has no problem with Harcourt and the Board
reviewing her documentation.

Even if Walters did intend to bar Defendants from reviewing her paperwork, if they
were earnest about conducting a meaningful review of her request they could have asked for
alternative documentation. Contrary to Defendants' argument, Defendants did not have to have
knowledge of the contents of the paperwork, only that the paperwork had been submitted and
a request had been made. If they were unsure of Walters' disability or her need for an emotional

Case: 3:12-cv-00024-RAM-RM   Document #: 318   Filed: 02/27/20   Page 11 of 23

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*                    Civil No. 12-00024
Opposition to Board & Ass. Motion for Summary Judgment                                    Page 11

support animal, it was incumbent upon them "to request documentation or open a dialogue."

*Nelson* 2016 WL 4154708 at *24 (*citing Jankowski Lee & Associates v. Cisneros*, 91 F.3d 891,

895 (7th Cir. 1996)); *see also* April 25, 2013 Fair Housing and Equal Opportunity Notice at 3

("A housing provider may not deny a reasonable accommodation request because he or she is

uncertain whether or not the person seeking the accommodation has a disability or a disability-

related need for an assistance animal.").

   All that is required for a refusal to occur is for the housing authority to know a request

has been made but fail to take steps to provide reasonable accommodation. *Nelson*, 2016 WL

4154708 at *18. In this case, there is no evidence that Cowpet or the Board ever initiated a

dialogue with Walters in order to follow up on her request for reasonable accommodation or

inquire into the validity of her disability. Because the Board did not grant an accommodation

to Walters either in February 2011, or in the fall of 2011, they effectively denied Walters'

request for reasonable accommodation. Defendants did not grant Walters' request for

accommodation until April 2012. This delay of over a year is tantamount to a refusal to provide

a reasonable accommodation. *See, e.g., Revock,* at 111 ("Cowpet did not have to deny Walters

and Kromenhoek their emotional support animals in order to 'refuse' a reasonable

accommodation. As a matter of law, Cowpet may have refused a reasonable accommodation

by declaring Walters and Kromenhoek in violation of the 'no dogs' rule, by fining them fifty

dollars a day or through undue delay.").

   In this case, Defendants were on notice as early as February 2011 (CSOF ¶8) and

certainly no later than October 2011. CSOF ¶34. They did not make their final determination

until March 2012. CSOF ¶117. This meant that for over a year they had the opportunity to

conduct a review and make an accommodation. Even if, for the sake of argument, Walters did

not make a request until September 2011, Defendants still had six months to make an

accommodation. As soon as Harcourt was made aware of Walters' paperwork in the Cowpet

office Defendants were on notice of Walters' request. The affidavit of the office manager, Schechter, confirms that Harcourt "came to the office and reviewed the documents…" CSOF ¶14. Schechter further avers that Harcourt "also sent his 'representative' Bill Canefield, another Board member to review the documents." CSOF ¶15. Once Defendants were aware that a request had been made they were under an obligation to make a decision; either immediately granting the request or conducting a meaningful review. *Nelson*, 2016 WL 4154708 at *18.

Because there is no dispute of fact that Defendants were given an opportunity to accommodate and failed to do so for at least six months, Defendants' motion for summary judgment on Count I should be denied.

**B.    Walters was denied a reasonable accommodation even though she was allowed to keep her dog with her**

In its Motion for Summary Judgment, Defendant Cowpet argues that "Ms. Walters was never denied the accommodation she requested whether there was a delay or not as she maintained the dog on Cowpet's property at all times while she was in residence." CBW Summary Judgment Memorandum 2/1/20, p.12. In support of this argument, Defendant relies on *Dubois v. Association of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175 (9th Cir. 2006). In that case, the housing authority was found not to have denied a reasonable accommodation on the basis that the defendants had never prevented the plaintiffs from keeping their dog in their property. *Id.* at 1179 ("The Condominium Association never required Einstein [the dog] to leave and thus never refused to make the requested accommodation.").

That case, however, is distinguishable from this case because of one essential difference in the facts. In *Dubois*, after the plaintiffs "requested an accommodation, the Condominium Association granted them a temporary exemption from the bylaw while it investigated and decided what to do." *Id.* By contrast, in this case the condominium association made it clear that Walters was in violation of the bylaws and imposed a fine. CSOF ¶¶24, 88.

The issue in both of these cases is not whether or not the plaintiffs were denied their emotional support animals but the speed with which the housing authorities addressed the issue. In *Dubois*, the defendants responded immediately to the plaintiffs' request. They allowed the dog to stay on the property while they determined a course of action. By acknowledging the request and initiating an investigation, the *Dubois* defendants followed the correct course of action. Following up on a request for a reasonable accommodation by asking for additional medical information from the plaintiffs' treating physicians is not an undue delay that would result in a denial of a request for reasonable accommodation. It is in fact a "reasonable accommodation" in and of itself. *See, e.g., Astralis Condominium Ass'n v. Secretary, U.S. Dept. of Housing and Urban Development*, 620 F.3d 62, 69 (1st Cir. 2010). In *Astralis* the First Circuit held that the granting of temporary exemption was, in itself, an accommodation and distinguished its facts and conclusions of law from *Dubois*:

> Astralis also complains that it should not be held responsible because it never expressly refused to accommodate the complainants. In voicing this complaint, Astralis mistakenly relies on *DuBois*. Unlike in this case, the condominium association in *DuBois granted* a temporary exemption pending an inquiry into the accommodation request. That exemption – a reasonable accommodation for the perceived medical necessity – was in place when the administrative claim was instituted, and the condominium association "thus never refused to make the requested accommodation." That is a far cry from the instant case, in which Astralis never granted the complainants permission to park in the handicapped spaces nearest to their unit. In fact, when the complainants unilaterally parked in those spaces, they received violation notices. *DuBois* is, therefore, readily distinguishable.

*Astralis Condominium Ass'n v. Secretary, U.S. Dept. of Housing and Urban Development*, 620 F.3d 62, 69 (1st Cir. 2010).

The time between a request and a final decision is not an undue delay if the housing authority takes some kind of immediate action. An undue delay occurs when the housing authority fails to acknowledge a request for reasonable accommodation or take any action whatsoever. The only similarity between this case and *Dubois* is the fact that the plaintiffs in

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*      Civil No. 12-00024
Opposition to Board & Ass. Motion for Summary Judgment      Page 14

both cases were allowed to keep their dogs. This argument ignores the crucial difference in the conduct of the two condominium associations and why that difference meant one association denied the request but the other did not. In Walters' case, they doubled down and retaliated by fining her. Since Defendants in this case, unlike the defendants in *Dubois*, failed to make any reasonable accommodation or conduct a meaningful review, *Dubois* cannot be relied on to support Defendant's argument.

Defendants also rely on *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.Appx. 617, (6th Cir. 2011) to support their argument that because Walters was never denied the company of her dog she was never denied a reasonable accommodation. In that case, the Sixth Circuit held that the housing provider's need to clarify the law justified the delay in granting a request for reasonable accommodation. *Overlook Mut. Homes, Inc. v. Spencer*, 415 Fed.Appx. 617, 622 (6th Cir. 2011). The housing provider in *Overlook* was seeking clarification regarding the distinction between a "service animal" and a "companion animal" and the training requirements for each. *Id. Overlook* is distinguishable from this case because at no point has Cowpet or the Board ever claimed that its need for legal clarification was the cause of their delay.

On the contrary, Defendants completely ignore the fact that they sought legal advice or that Walters sent them a legal memorandum. The undersigned sent Defendants a letter on December 16, 2011 explaining Walters' legal argument. CSOF ¶84. Defendants then received their own legal advice on February 7, 2012. CSOF ¶112. Despite having legal memoranda from both sides in the matter, Defendants still claim they were unaware of Plaintiff's request for reasonable accommodation until March 2012. To claim ignorance of a request while at the same time seeking legal advice about it, is nonsensical and contradictory. Far from supporting Defendants' motion, *Overlook* establishes it is without merit.

## II. DEFENDANTS INTERFERED WITH WALTERS' EXERCISE OF HER FAIR HOUSING RIGHTS IN VIOLATION OF 42 U.S.C. § 3617

Defendants' second argument is that Plaintiff fails to establish a violation of 42 U.S.C. § 3617. Under the Fair Housing Act, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. "A Section 3617 interference claim requires proof of three elements: (1) that the plaintiff exercised or enjoyed 'any right granted or protected by' Sections 3603-3606; (2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." *Revock*, 853 F.3d at 112-13 (*citing* 42 U.S.C. § 3617).

Since the FHA does not define the terms "intimidate", "threaten" or "interfere" the words must be "understood by [their] ordinary meaning." *United States v. Piekarsky*, 687 F.3d 134, 145 (3d Cir. 2012) (*cited by Revock* at 113). "Interference under Section 3617 may consist of harassment, provided that it is 'sufficiently severe or pervasive' as to create a hostile environment." *Revock*, 853 F.3d at 113 (*citing Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010)); *see also Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir. 1993). This has been recognized as a cause of action in numerous Circuits. *Revock*, 853 F.3d at 113 ("Numerous decisions of our sister Circuits have recognized such a cause of action in the housing context."). "Harassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive." *Revock*, 853 F.3d at 113 (*citing Frisby v. Schultz*, 487 U.S. 474, 485(1988) (citation omitted)). Interference encompasses more than physical force or intimidation. *See, e.g., Mich. Protection & Advocacy Serv*., *Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994) ("Section 3617 is not limited to those who used some sort of potent force or duress, but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus."). The language of the FHA is to be interpreted in a broad and inclusive manner. *See, e.g., Trafficante v.*

*Metropolitan Life Ins. Co.,* 409 U.S. 205, 209 (1972); *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001). "Interference" has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under federal fair housing laws. *Id*. Interference is the act of meddling in or hampering an activity or process. *Id*.

As the Third Circuit opinion in this case pointed out, since HUD issued its decision in December 2011 it has since issued a regulation providing that Section 3617 may be violated by "hostile environmental harassment because of . . . handicap." 24 C.F.R. § 100.600(a) (2016). Whether hostile environmental harassment exists depends on the totality of the circumstances. Factors include: "the nature of the conduct, the context in which the incident(s) occurred, the severity, scope, frequency, duration, and location of the conduct, and the relationships of the persons involved." *Id*. "Neither psychological nor physical harm must be demonstrated to prove that a hostile environment exists." *Id.* "Whether unwelcome conduct is sufficiently severe or pervasive as to create a hostile environment is evaluated from the perspective of a reasonable person in the aggrieved person's position". *Id.* In addition, "[a] single incident of harassment because of race, color, religion, sex, familial status, national origin, or handicap may constitute a discriminatory housing practice, where the incident is sufficiently severe to create a hostile environment, or evidences a quid pro quo." *Id.*

## A. Walters exercised rights protected by the FHA

It is undisputed that Walters was handicapped. As such, two of the activities she engaged in are protected by the FHA. Requesting a reasonable accommodation constitutes a protected activity. *See, e.g., Donovan v. Woodbridge Maint. Ass'n,* 2015 WL 1241020, at *4 (E.D.Cal. Mar. 17, 2015) ("Protected activities [under the FHA] include the request for a reasonable accommodation for handicapped persons.") (internal citations omitted); *Wilson v. Wilder Balter Partners, Inc.,* 2015 WL 685194, at *12 (S.D.N.Y. Feb. 17, 2015) ("[A] request for a reasonable accommodation is [a] protected activity under the FHA.") (internal quotation

Case: 3:12-cv-00024-RAM-RM  Document #: 318  Filed: 02/27/20  Page 17 of 23

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*          Civil No. 12-00024
Opposition to Board & Ass. Motion for Summary Judgment                              Page 17

marks omitted); *see also, Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002). Filing an administrative complaint also constitutes a protected activity. *See, e.g., Miller v. Bd of Managers of Whispering Pines at Colonial Woods Condo, II*, 457 F. Supp. 2d 126, 131 (E.D.N.Y. 2006) (A protected activity under the FHA "includes an action taken to protest or oppose statutorily prohibited discrimination."). Defendants do not contest that Walters' is handicapped nor do they dispute that Walters requested a reasonable accommodation and filed an administrative complaint with HUD or that these were protected activities. Thus the first element of a claim under 42 U.S.C. § 3617 is met.

**B.      Defendants Cowpet and the Board interfered with Walters' FHA rights when they delayed granting her a reasonable accommodation and engaged in hostile environmental harassment**

Any conduct that has the effect of hampering an activity or process is considered "interference" under the FHA. *See, e.g., Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001). A delay in granting a reasonable accommodation request, hostile environmental harassment, and retaliation are all activities that hamper the process of reasonable accommodation and as such all constitute interference of Walters' FHA rights and violation of the FHA.

Walters filed an application for a reasonable accommodation in February 2011. CSOF ¶8. Soon after she filed her application, Walters came under intense fire by both members of the Association and the Board for "having an illegal pet" on the premises. CSOF ¶¶31-33. The Association and Board discussed her application with non-Board members and her private and confidential documents were posted on the internet in an effort by members of the Board and the Association "to seek out the truth" about Walters' disability and Happy's status as an emotional support animal. *Id.* After Walters filed her Administrative complaint with HUD, she came under additional fire by both members of the Board and the Association. CSOF ¶¶91, 92. By failing to review Walters' request for reasonable accommodation and instead assessing

Walters a fine Cowpet interfered with Walters' FHA rights. The actions of the Board and the Association were made after they received a letter from Walters' attorney and in spite of the fact that they knew Walters' application for reasonable accommodation was pending in the office.

The Third Circuit has already determined that "[i]f Walters and Kromenhoek barred Cowpet from reviewing their accommodation requests, then Cowpet did not 'interfere' with their rights. But if there was not such a ban, then Cowpet did 'interfere' with their rights by failing to review their requests for a reasonable accommodation of their disabilities." *Revock*, 853 F.3d at 112. As argued above, Defendants were never denied access to Walters' application. All she asked was for the Board to keep it confidential from non-board members. As such, the Board and the Association interfered with her rights under the FHA when it unduly delayed granting her a reasonable accommodation and when it imposed a fine on her despite having received notice from her, her attorney and HUD that she was requesting reasonable accommodation. Any dispute of material fact is resolved in favour of Plaintiff and as such this Court should deny Defendants' motion for summary judgment on Count III of the Revised Third Amended Complaint.

## C. Defendant Cowpet and the Board interfered with Walters' FHA rights when they retaliated against her

Not only did imposing a fine after Walters filed a complaint with HUD constitute interference, it also constitutes retaliation under the FHA. "Retaliation claims brought pursuant to [§ 3617] are analyzed under the same standards that are applied to retaliation claims brought under Title VII and other employment discrimination statutes." *Texas v. Crest Asset Mgmt., Inc.,* 85 F.Supp.2d 722, 733 (S.D.Tex. 2000) (*citing Caractor v. Town of Hempstead,* 159 F.3d 1345, 1998 (2d Cir. June 11, 1998)). Accordingly, to state a claim for retaliation a plaintiff must demonstrate that "(1) he engaged in an activity that [the FHA] protects; (2) he was subjected to

an adverse [action by the defendant]; and (3) a causal connection exists between the protected

activity and the adverse ... action." *Cox v. Phase III, Invs.,* 2013 WL 3110218, at *10 (S.D.Tex.

June 14, 2013) (*citing LeMaire v. La. Dep't of Transp. & Dev.,* 480 F.3d 383, 388 (5th Cir.

2007) (discussing requirements to assert a claim for retaliation under Title VII)).

As discussed above, requesting a reasonable accommodation and filing an

administrative claim are both protected activities under the FHA. As such, the first prong of

Plaintiff's retaliation claim is met. The second prong is met because shortly after Walters filed

her application for a reasonable accommodation she came under intense fire by both members

of the Association and Board for "having an illegal pet" on the premises. In addition, Walters'

private and confidential documents were posted on the internet in an effort by members of the

Board and the Association "to seek out the truth" about Walters' disability and Happy's status

as an emotional support animal. After Plaintiff filed her Administrative complaint with HUD,

she came under additional fire by both members of the Board and the Association. Finally,

Defendants imposed a fine on Walters after she filed her claim with HUD. The fine constitutes

adverse action in response to a protected activity and as such is retaliatory. *See, e.g., Crest Asset

Mgmt.,* 85 F.Supp.2d at 733 (holding that threats and intimidation after plaintiff filed a

complaint of housing discrimination is "direct evidence of retaliation in violation of

the FHA"). Since this argument is based on undisputed facts that show that Defendants Cowpet

and the Board violated 42 U.S.C. §3617 this Court should deny Defendants' motion for

summary judgment on Count III.

> **D.    There was a causal connection between Walters' exercise of her fair housing
> rights and the conduct of Cowpet and the Board**

Cowpet and the Board's harassment was in direct response to Walters' exercise of her

rights under the FHA. It was because Walters had requested to keep an emotional support

animal on the premises that the Board and Association so vehemently attacked her. The

intimidating and harassing messages from members of the Board, in conjunction with those of

other residents, directly resulted in Walters being unable to enjoy her home. CSOF ¶¶36, 52,

54, 56, 62, 79, 80.  Hence, there was a direct and undeniable causal connection between the

conduct of Cowpet and the Board and Walters' exercise of her fair housing rights. As such,

there is no dispute of material fact that Defendants violated 42 U.S.C. § 3617 and summary

judgment on Count V should be denied.

## III.  DEFENDANTS ARE LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

This Court has adopted the standard for intentional infliction of emotional distress set

forth in Section 46(1) of the Restatement (Second) Torts: "One who by extreme and outrageous

conduct intentionally or recklessly causes severe emotional distress to another is subject to

liability." *Desir v. Hovensa, L.L.C.*, CIVIL 2007/97, 2012 WL 762122 (D.V.I. Mar. 7, 2012).

Recovery for intentional infliction of emotional distress "is limited to situations where 'the

conduct has been so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

society.' " *Id.* (*quoting* Restatement (Second) Torts § 46, cmt. d); *see also Petersen v. First

Fed. Sav. & Loan Ass'n of P.R. Inc.,* 617 F.Supp. 1039, 1042 (D.V.I. 1985) ("The plaintiff must

make a showing that defendant's conduct was so outrageous that no reasonable person in a

civilized society should be expected to endure it.").

Substantively, the Court is to consider whether Defendants' conduct was so

outrageous that no reasonable person in a civilized society should be expected to endure it.

Where reasonable persons may differ, it is for the jury to determine whether the conduct is

sufficiently extreme and outrageous so as to result in liability. *See, e.g., Motheral v. Burkhart,*

583 A.2d 1180, 1188 (Pa. Super. Ct. 1990); Restatement (Second) of Torts § 46. Such

emotional damages are available for distress which exceeds the normal transient and trivial

aggravation attendant to securing suitable housing. *See, e.g., Morgan v. Sec'y of Hous. & Urban Dev.,* 985 F.2d 1451, 1459 (10th Cir.1993). Emotional harm has been generally classified as "humiliation, embarrassment, emotional distress, and other such intangible harms to plaintiff's personality." *Krueger v. Cuomo,* 115 F.3d 487, 492 (7th Cir.1997). The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional damages. *Id.* The distress that Plaintiff felt exceeds the normal transient and trivial aggravation attendant to securing suitable housing.

Generally, conduct would be found to be actionable where the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Restatement (Second) of Torts §46. In this case there is no dispute that the actions of Cowpet and the Board would be considered outrageous by a reasonable jury. The Board and Association refused to grant Walters' request for accommodation. They charged her fines for having her dog on the property. CSOF ¶88. They ostracized her from the community. CSOF ¶¶44, 96. And, most damaging, they leaked Plaintiff's private and confidential documents to then be posted on a public forum.

Contrary to Defendants' arguments, these actions, taken alone or considered together as part of a course of conduct, are sufficiently outrageous to state a claim for intentional infliction of emotional distress. Even if the fines were, as Defendants argue, "held in abeyance and later waived by these Defendants" it was the constant threat of having to pay thousands of dollars in fines that caused Walters emotional distress. From the moment the fines were imposed Walters was living fear that she would have to pay a huge sum in fines. She had no idea that the fines would eventually be waived, and Defendants argument based purely on hindsight is no defense. Just because the fines were eventually waived, it doesn't make the

emotional distress suffered by Walters before the waiver any the less. As such, this Court should

deny Defendants' motion for summary judgment with regard to Count VIII of the Revised

Third Amended Complaint.

## CONCLUSION

There is no dispute of fact that the Association and the Board of Cowpet Bay West

Condominiums breached the Fair Housing Act when they denied Walters her request for

reasonable accommodation. Neither the Association nor the Board was ever denied access to

the papers submitted by Walters and thus the delay in over a year in granting her request was

the equivalent of a denial. Furthermore, there is no dispute of fact that in delaying granting the

request and imposing a fine both Defendants interfered with Walters' FHA rights pursuant to

Section 3617. Finally, the acts of Defendants were so outrageous that they constituted an

intentional infliction of emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that this Court **DENY** Defendants'

Motion for Summary Judgment.


Dated:  February 27, 2020                    Respectfully Submitted,

                                             **LAW OFFICES OF KARIN A. BENTZ, P.C.**


                                              /s/ Karin A. Bentz_____
                                             **Karin A. Bentz, Esq. (V.I. Bar No. 413)**
                                             7605 Bonne Resolution
                                             St. Thomas, VI 00802-6309
                                             Telephone: 340-774-2669
                                             Email: kbentz@virginlaw.com

*Barbara Walters v. Cowpet Bay West Condominium Assoc., et al.*                    Civil No. 12-00024
Opposition to Board & Ass. Motion for Summary Judgment                                    Page 23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the filing and service of the foregoing with the Clerk of the District Court of the Virgin Islands using the CM/ECF system, which will provide electronic notice by email to the following.

Richard P. Farrelly, Esq.
Birch de Jongh & Hindels, PLLC
1330 Taarneberg
St. Thomas, VI 00802
E-mail: rfarrelly@bdhlawvi.com

Kyle T. Berglin, Esq.
Boyd Richards Parker & Colonnelli, P.L.
100 S.E. Second Street, Suite 2600
Miami, FL 33131
kberglin@boydlaw.group.com

John Benham, III, Esq.
The Law Offices of Benham and Chan
P. O. Box 11720
St. Thomas, VI 00801
E-mail: jhbenham@wattsbenham.com

Ryan S. Meade, Esq.
Quintairos, Prieto, Wood and Boyce, P.A.
9300 South Dadeland Blvd., 4th Floor
Miami, FL 33156
E-mail: rmeade@qpwblaw.com


/s/ Karin A. Bentz